DWIGHT, P. J., and CORLETT, J., concurred.

That portion of the order which is appealed from reversed, but without costs.

---

IN THE MATTER OF THE APPLICATION OF THE ROCHESTER ELECTRIC RAILWAY COMPANY TO ACQUIRE LANDS OF JENNIE S. WILKIN, JAMES S. PATTEE, MARY TANNER, ELIZA PATTERSON AND WILLIAM PATTERSON.

*Street railroad — condemnation of land by it — a map must be filed — rights in a public highway appropriated by a street railroad company.*

It was the design of the act, chapter 252 of the Laws of 1884, to confer upon street railroad companies the power to acquire property belonging to private individuals, by condemnation thereof under the exercise of the power of eminent domain.

A street railroad, in taking proceedings to condemn land which has been used as a public highway, should file a map clearly pointing out the route to be adopted by it so that the parties in interest may determine whether there exists any ground for opposition to such appropriation of the land.

Where a public highway is controlled and practically owned by a turnpike company, the right of the public to use the highway remains unimpaired. The

turnpike company has no power to destroy the highway or to limit its operation to its exclusive use by using it for railroad purposes.

The control and oversight of the commissioners of highways over a road of the town does not cease because a turnpike company has appropriated the same.

APPEAL by certain land owners from an order, entered in the office of the clerk of the county of Monroe on the 24th day of March, 1890, confirming the report of George A. Carnahan, referee, and appointing commissioners In the Matter of the Application of the Rochester Electric Railroad Company to acquire certain land by the exercise of the right of eminent domain.

*J. & Q. Van Voorhis*, for the land owners, appellants.

*James Breck Perkins*, for the railway company, respondent.

CORLETT, J.:

The highway from Rochester to Charlotte, which is an extension of Lake avenue, is five miles in length. It has been for a long time the main thoroughfare from Rochester to the lake. This highway was bounded by a row of shade trees on each side for nearly the whole length. In 1880 the Rochester and Charlotte Turnpike Road Company was organized for the purpose of maintaining this highway as a turnpike, with a charter extending thirty years. Soon after the company, by purchase from the adjoining land owners, obtained a strip seventeen feet wide on each side for a bridle path, upon which the owners moved back their fences. The language of the deed was: " For value received of the Rochester and Charlotte Turnpike Road Company, a corporation organized under the laws of the State of New York, we, the undersigned, do hereby respectively grant and convey to the said corporation and to its successors or assigns a right of way, in, over and through a strip or piece of land seventeen feet in width to be measured and taken off the front of the lands belonging to us respectively, fronting on and along the highway running from the northerly boundary line of the city of Rochester, Monroe county and State of New York, to the village of Charlotte (and formerly known as the Rochester and Charlotte Plank Road), in the town of Greece in said county, for the purpose

of building and constructing and operating the turnpike road of said corporation about to be built."

On the 11th of November, 1887, in consideration of $6,000, said Turnpike Company consented to allow the Rochester Electric Railway Company to construct, operate and maintain its street surface railway along the west side of the bridle path between Rochester and Charlotte. In August of the same year a map and profile were filed by the railroad company calling for such strip twelve feet wide, on the west edge of the bridle path. The map which was filed had lines indicating the original lines of the roadway, and the dividing lines between that and the bridle path. The petition filed described the strip as follows: The land which it desires belonging to the land owners in the present proceeding was a strip twelve feet wide on the west edge of the bridle path, and no more.

A railroad was built along that route from Rochester to Charlotte. Its motive power was electricity. The present petition was verified on the 15th day of November, 1889. It contains the same phraseology as the one of 1888, except as to dates, parties and route. It makes no mention of the railroad which had been built, and alleges that it has surveyed a route for its road and that it has not been able to purchase the same, and describes a strip of land on the eastern edge of the bridle path twelve feet wide. It also alleges the filing of a map and survey of the route. No map was ever filed except the first one.

An answer was interposed by the objecting land owners and a reference was ordered to John A. Carnahan, Esq., to report the facts with his opinion thereon. He made his report on the 17th day of February, 1890, and decided that the railroad had power to acquire lands without consent in this proceeding; also, that the company was under no obligations to file any map. He further held that no consent from any authorities of the town of Greece had been obtained and that none was necessary. He further reaches the conclusion that the consents of the owners of one-half the value of the property bounded on the highway had been obtained.

This street railroad was built under chapter 252 of the Laws of 1884. Section 1 provides, among other things: " Such corporations shall also have all the powers and privileges granted, and be subject to all the liabilities imposed by this act, or by the act entitled, ' An act

to authorize the formation of railroad corporations and regulate the same,' passed April 2d, 1850, and the several acts amendatory thereof, except as such acts are herein modified."

Section 22 of the act of 1850, as amended by chapter 560 of the Laws of 1871, provides: "Every company formed under this act, before constructing any part of their road into or through any county named in their articles of association, shall make a map and profile of the route," etc.

Section 3 of the Laws of 1884 requires the consent of the local authorities having control of that portion of the streets or highways upon which it is proposed to construct and operate the railroad.

The report of the referee was confirmed; from that order the contesting land owners appeal.

The appellants contend, among other things, that a map should have been filed and that the consent of the local authorities and the highway commissioner of the town of Greece should have been obtained. The appellant also insists that private property cannot be obtained without the consent of the owners. It is manifestly the design of the act of 1884 to confer power upon street railroads to acquire property belonging to private individuals by condemnation. Section 1 provides, among other things, that a street railroad corporation shall have the same powers as those conferred by the act of 1850. Section 3, among other things, provides that a street railroad company may build its road, switches, etc., through, upon and along any of the streets, avenues, roads or highways of such cities, towns, villages, *and also through, along and upon any private property* which said company may acquire for the purpose.

It thus appears that the same power is conferred upon street railroad corporations as upon general railroad corporations, except as limited by the act, which contains nothing prohibiting the taking by condemnation proceedings of private property. The consent required by section 3 implies power to take the lands of those who do not consent. The owners of adjoining lands have title to the highways, subject to the easement; aside from this, it will be observed that the power of street railroads to acquire or build roads is not limited to public highways. It may take any land not connected with highways. The want of condemnation power might utterly prevent the building of the most useful of street railroads.

The learned referee, in his opinion, proceeds upon the assumption that the Boulevard Turnpike Company controlled and practically owned the highway, and that the power of the commissioner over it had practically ceased, and, therefore, his consent was not necessary.

In *Walker* v. *Caywood et al.* (31 N. Y., 51) it was held that a public highway does not cease to be such because taken by a plank-road company, and that the right of the public to use the highway remains unimpaired. To the same effect is *Benedict* v. *Goit* (3 Barb., 459). It thus appears that neither a turnpike company or a plank-road corporation has power to destroy a highway or to appropriate it to its exclusive use. The public still have the right to travel upon all its highways until they cease to exist. The diverting a highway from its ordinary use to railroad purposes necessarily involves matter of grave concern to the public as well as land owners. (*Craig* v. *Rochester City and Brighton R. R. Co.*, 39 N. Y., 404.)

The control and oversight of a commissioner of highways does not cease because a turnpike company appropriates some of the roads of the town. He still owes a duty to the public. A continuous obligation rests upon him to see that the highways of the town are protected and kept for public use and travel. He may be of the opinion that the use of twelve feet of a highway for street railroad purposes would inflict no injury upon the traveling public; but he may reach the conclusion that the taking of another twelve feet would practically destroy its usefulness. The turnpike company, as the case shows, sold the privilege of use of the highway to the railroad company for a large consideration, which, it may be assumed, was kept for the use and benefit of the company, and that the town received no advantage therefrom.

The reasoning of the learned referee proceeds on the assumption that neither the public officers of the town or the public have any concern in a highway, or the uses for which it is appropriated, after it is turned over to a turnpike corporation. This view cannot be sustained. Its adoption would confer upon turnpike companies and plank-road corporations power to destroy the usefulness of the highways of the town without its consent, or that of its inhabitants or officers.

The learned referee also argues that there is a broad distinction between the reasons for filing a map in the case of steam corpora-

tions and street railroads. But it is quite clear that they do not extend to the length stated by him. Highways are of varying width; a railroad track might, without serious inconvenience, be placed upon one part of a public highway, but would injuriously affect another. It might be so constructed as to seriously interfere with the owners of land on each side of it, or it might be so built as to impose no particular inconvenience. The railroad company, therefore, should file a map clearly pointing out the route, so that those interested could determine whether there were good grounds of opposition. The absence of a map would frequently prevent that accurate knowledge which would enable owners and those concerned to determine whether to resist or acquiesce. No reason, therefore, is perceived why a street railroad should be relieved from filing a map the same as steam corporations. Aside from this, as already shown, street railroads may be built through private lands, outside of any highways, and certainly there would be just as strong reasons for the filing of a map in such cases as in that of steam roads. In addition to this, section 1 provides that such corporations shall have all the powers and be subject to all the liabilities imposed by the general railroad act, except as modified. There is no force in the contention that the obtaining of twelve feet for a railroad confers authority to appropriate an additional twelve feet.

There is nothing in the act of 1884 which exempts street railroads from filing maps. It is not necessary to determine the question of whether the consents were sufficient, as the conclusions reached as to the highway commissioner and the filing a map disposes of the appeal.

The order should be reversed.

DWIGHT, P. J., and MACOMBER, J., concurred.

Order appealed from reversed, with ten dollars costs and the motion denied.